UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| N.B., a minor child,<br><br>                                    Petitioner,<br><br>v.<br><br>WILLIAM P. BARR, Attorney General of the United States; KEVIN K. MCALEENAN, Acting Secretary of the U.S. Department of Homeland Security; MARK A. MORGAN, Acting Commissioner of U.S. Customs and Border Protection; MATTHEW T. ALBENCE, Acting Director of Immigration and Customs Enforcement; DR. STEWART D. SMITH, Assistant Director for ICE Health Services Corps; FRED FIGUEROA, Warden of the Otay Mesa Detention Center; OLIVER CASTANEDA, Deportation Office, Otay Mesa Detention Center; CORECIVIC, LLC, a Delaware limited liability corporation,<br><br>                                    Respondents. | Case No.:  19-CV-1536 JLS (LL)<br><br>**ORDER (1) APPOINTING HUGO IVAN SALAZAR AS "NEXT FRIEND" TO MINOR PETITIONER N.B. PURSUANT TO 28 U.S.C. § 2242, AND (2) PRELIMINARILY ENJOINING RESPONDENTS FROM FURTHER UNLAWFULLY DETAINING N.B.**<br><br>(ECF No. 1) |

Presently before the Court is Petitioner N.B.'s Verified Petition for Writ of Habeas Corpus ("Pet.," ECF No. 1). Also before the Court are the Return to the Petition ("Ret.,"

ECF Nos. 6, 10) filed by Respondents William P. Barr, Attorney General of the United States; Kevin K. McAleenan, Acting Secretary of the United States Department of Homeland Security ("DHS"); Mark A. Morgan, Acting Commissioner of the United States Customs and Border Protection ("CBP"); Matthew T. Albence, Acting Director of Immigration and Customs Enforcement ("ICE"); Dr. Stewart D. Smith, Assistant Director for ICE Health Services Corps ("IHSC"); Fred Figueroa, Warden of the Otay Mesa Detention Center; Oliver Castaneda, Deportation Officer, Otay Mesa Detention Center; and CoreCivic, LLC, as well as Petitioner's corrected Verified Traverse ("Trav.," ECF No. 9), both filed in response to the Court's August 19, 2019 Order to Show Cause Pursuant to 28 U.S.C. § 2243. *See generally* ECF No. 5.

The Court finds this matter suitable for determination without oral argument pursuant to Civil Local Rule 7.1(d)(1) and without holding an evidentiary hearing pursuant to 28 U.S.C. § 2243. Having carefully considered the Parties' arguments, the evidence, and the law, the Court **APPOINTS** Hugo Ivan Salazar to serve as N.B.'s "next friend" pursuant to 28 U.S.C. § 2242 and **PRELIMINARILY ENJOINS** Respondents from further unlawfully detaining N.B. in custody with unrelated adults.

## BACKGROUND

### I.    Legal Background

United States Magistrate Judge James P. Donohue provided a thorough overview of the legal framework relevant to the instant Petition in *B.I.C. v. Asher*, No. C16-132-MJP-JPD, 2016 WL 8672760 (W.D. Wash. Feb. 19, 2016):

> Before the creation of DHS in 2002, the care and placement of unaccompanied alien children ("UAC") in the United States was the responsibility of the Office of Juvenile Affairs in the former Immigration and Naturalization Service ("INS"). *See F.L. v. Thompson*, 293 F. Supp. 2d 86, 96 (D.D.C. 2003). In 2002, INS's functions were split between the enforcement of federal immigration law, which was left to DHS, and the care of immigrant children, which was left to HHS. *See* Homeland Security Act, Pub. L. No. 107-296, 116 Stat. 2135 (2002) ("HSA"). Those laws were amended again in 2008 through the

William Wilberforce Trafficking Victims Protection Act ("TVPRA"), further separating DHS's and HHS's functions by placing the care and custody of children under HHS's jurisdiction and clarifying the respective roles and responsibilities of the two agencies with respect to UACs.

## A.    The Homeland Security Act of 2002

With the enactment of the HSA, Congress created DHS and transferred most immigration functions formerly performed by INS to DHS and its components, including U.S. Citizenship and Immigration Services, U.S. Customs and Border Protection, and ICE.    *See* HSA;    Department of Homeland Security Reorganization Plan Modification of January 30, 2003, H.R. Doc. No. 108-32 (2003) (also set forth as a note to 6 U.S.C. § 542).  Notably, Congress transferred to [the Office of Refugee Resettlement ("ORR")] the responsibility for the care of any UAC "who [is] in Federal custody by reason of [his or her] immigration status."  6 U.S.C. §§ 279(a), (b)(1)(A).  The HSA also transferred to ORR the responsibility for making all placement decisions for UACs, required ORR to coordinate these placement decisions with DHS, and required ORR to ensure that UACs are not released upon their own recognizance.  *See* 6 U.S.C. §§ 279(b)(l)(C), (D), (b)(2).

## B.    The Trafficking Victims Protection Reauthorization Act of 2008

The TVPRA, which was signed into law on December 23, 2008, contains statutory protections relating to UACs and codified protections related to the processing and detention of UACs.  The TVPRA built on the split of duties in the HSA and further requires that "the care and custody of all unaccompanied alien children, including responsibility for their detention, where appropriate, shall be the responsibility of the Secretary of Health and Human Services."  8 U.S.C. § 1232(b)(1).  It also provides that in most instances, "any department or agency of the Federal Government that has an unaccompanied alien child in custody shall transfer the custody of such child to the Secretary of Health and Human Services not later than 72 hours after determining that such child is an unaccompanied alien child."  8 U.S.C. § 1232(b)(3).

The TVPRA makes clear that HHS is responsible for all placement decisions for UACs in its custody, and for conducting suitability assessments for those placements. 8 U.S.C. § 1232(c). It requires that UACs in HHS custody be "promptly placed in the least restrictive setting that is in the best interest of the child," and it provides guidelines for the reunification of UACs with their families by HHS. 8 U.S.C. § 1232(c)(2), (3).

The protections TVPRA affords UACs apply after the HHS, in consultation with DHS, determines that the applicant is indeed a child. 8 U.S.C. § 1232(b)(a). Importantly for this litigation, the TVPRA provides:

> The Secretary of Health and Human Services, in consultation with the Secretary of Homeland Security, shall develop procedures to make a prompt determination of the age of an alien, which shall be used by the Secretary of Homeland Security and the Secretary of Health and Human Services for children in their respective custody. At a minimum, these procedures *shall take into account multiple forms of evidence, including the non-exclusive use of radiographs,* to determine the age of the unaccompanied alien.

8 U.S.C. § 1232(b)(4) (emphasis added).

## C.     ORR's age determination procedures[1]

Pursuant to § 1232(b)(4), ORR developed age determination procedures for individuals without lawful immigration status. *See* Dkt. 3-2 (Children Entering the United States Unaccompanied: Section 1 (updated Oct. 5, 2015) ("ORR Guide")). The ORR Guide provides that "HHS may make age determinations of [UACs] when they are in HHS custody on a reasonable suspicion that a child in HHS custody is 18 years or older." *Id.* at 8 (ORR Guide § 1.6.1). When conducting age determinations, ORR case managers are directed to seek the

---

[1] Magistrate Judge Donohue notes that "ICE developed a matching policy." *BIC*, 2016 WL 8672760, at *2 n.2.

following evidence, but information from each category is not required: (1) documentation, such as official government-issued documents and other reliable records that indicate the UAC's date of birth; and (2) statements by individuals who can credibly attest to the age of the UAC, including the UAC (but generally, a UAC's uncorroborated declaration regarding age is not used as the sole basis for an age determination). *Id.* at 8 (ORR Guide § 1.6.2).

When other information is "inconclusive," case managers may use medical age assessment procedures, such as dental maturity assessments using radiographs. *Id.* The ORR Guide provides that a "medical professional experienced in age assessment method(s) must perform the examination, taking into account the individual's ethnic and genetic background." *Id.* The ORR Guide recognizes that "no medical assessment method can determine an exact age [so] best practice relies on the estimated probability that an individual is 18 or older." *Id.* "The examining doctor must submit a written report indicating the probability percentage that the individual is a minor or an adult . . . If an individual's estimated probability of being 18 or older is 75 percent or greater, ORR will refer the individual to DHS." *Id.*

*B.I.C.*, 2016 WL 8672760, at *1–3 (all alterations but first in original) (emphasis in original) (footnotes omitted).

## I.    Factual and Procedural Background

N.B. is a citizen of the Republic of Guinea, Pet. ¶ 27; Resps.' Ex. (ECF No. 4-1) at 16, who speaks a tribal language known as Fella Minakakan and also French. Trav. ¶ 30(a). Having been threatened and fearing for his life, Resps.' Ex. at 3, 20, 23, N.B. decided to go to the United States, *id.* at 19, where his cousin lives. *Id.* at 18. On March 3, 2019, N.B. flew from Guinea to Ecuador. *Id.* at 2, 18. He then traveled by bus to Turbo, Colombia, *id.*, and by foot to Panama. *Id.* at 2–3; 18. N.B. then bussed through Costa Rica, Nicaragua, Honduras, and Guatemala, *id.* at 3, 18, where he lost his Guinea passport. *Id.* at 2, 3, 19–20. N.B. then took a bus through Mexico, from Tapachula to Tijuana. *Id.* at 3, 18.

In Tijuana, N.B. stayed in a center with other migrants. *Id.* at 3, 18. N.B. heard from a non-government organization and from other migrants about the San Ysidro port of entry. *Id.* at 18. Although he did not hire an attorney before coming to the United States, a lawyer named Nicole Ramos from Al Otro Lado brought N.B. to San Ysidro. *Id.* at 3, 18–19; Trav. ¶ 30(e). The attorney told N.B. that N.B. could request asylum in the United States by claiming fear because of sexual orientation, political or religious affiliation, or fear of returning to Guinea. Resps.' Ex. at 3, 19.

During his travels from Guinea to Mexico, N.B. gave his date of birth as December 1992 on the advice of an older friend, Grand Balpe, who informed N.B. that he would be deported immediately or detained as a minor and held until he was an adult. *Id.* at 2, 16; Trav. ¶ 30(a). In Costa Rica, Mr. Balpe helped N.B. complete an immigration form that was written in Spanish, a language N.B. does not know. Trav. ¶ 30(b). At Mr. Balpe's suggestion, *see id.*, N.B. used the December 1992 birthdate on the Costa Rican immigration form, which N.B. used to travel through Central America to the Mexican border. *Id.* ¶ 30(c). April 9 and 21, 2019 intake forms from ICE agents in Mexico reflect this December 1992 birthday. Resps.' Ex. at 5a, 7; Trav. ¶¶ 30(d), (g). Once in Mexico, N.B. was provided with a second immigration form, also written in Spanish, that he used to travel from Tapachula to Tijuana. Trav. ¶ 30(d). N.B. had difficulty understanding the form and does not recall what birthday he used on it. *Id.* Although a May 3, 2019 intake form notes that N.B.'s birthday was in December 2000, Resps.' Ex. at 6; Trav. ¶ 30(g), N.B. claims he never provided a December 2000 birthdate to Mexican officials. Trav. ¶ 31(a).

On May 22, 2019, N.B. presented himself at the United States port of entry in San Ysidro as an unaccompanied minor, Pet. ¶¶ 27, 38; Resps.' Ex. at 19, and requested asylum. Resps.' Ex. at 2. Although N.B. did not have legal documents allowing him entrance to the United States, *id.* at 2, 16, he presented an extract from his birth certificate bearing the seal of the Office of the Registrar and Chief Clerk of the Republic of Guinea and showing

/ / /

that he was born in December 2001.[2] Pet. ¶ 27; *see also* Pet. Ex. 1, ECF No. 1-2; Pet. Ex. 2, ECF No. 1-3; Resps.' Ex. at 2. N.B. also had in his possession a government-issued education system photo identification card indicating N.B. was born in December 2001,[3] *see* Pet. ¶ 36; Pet. Ex. 3, ECF No. 1-4; an April 30, 2019 extract of an April 11, 2019 judgment, certified May 9, 2019, ruling that N.B. was born in December 2001, *see* Resps.' Ex. at 35; and the April 11, 2019 judgment, certified May 9, 2019.[4] *See id.* at 36.

N.B. was taken in DHS custody and referred to CBP processing. Pet. ¶ 28. On May 25, 2019, he was placed in expedited removal proceedings pursuant to 8 U.S.C. § 1225(b)(1). Resps.' Ex. at 12. N.B. was held in solitary confinement for four days, Pet. ¶¶ 28, 39, and in the "ice box" for another twenty-four days. *Id.* ¶¶ 29, 39. On June 18,

///

---

[2] "In the Republic of Guinea, original birth certificates are not issued to individuals for them to retain, rather the government holds the original in a registry depository in the city hall of the individual's birth city—essentially a records department in the city hall." Trav. ¶ 33(3)(b) (citing ECF No. 4-2 at 1–2). "If someone wants to obtain the information contained within a birth certificate, they may request a birth certificate extract from the registry depository." *Id.* (citing ECF No. 4-2 at 2). "The extract contains the birthdate, 'child's surnames, given names and place of birth, as well as their parents' names, place of birth, procession and place of residence.'" *Id.* (quoting ECF No. 4-2 at 2).

[3] During his May 25, 2019 interview with DHS, N.B. indicated that "[he] d[id] not have a picture ID but [he] ha[d his] birth certificate from Guinea." Resps.' Ex. at 16. N.B. explains in his verified Traverse that he "misunderstood the questions being asked" because they were translated into French, which is a secondary language, not his native tongue. Trav. ¶ 54.

[4] According to Respondents, the April 11, 2019 judgment indicates that it was issued in response to the April 10, 2019 request of N.B.'s father, who passed away in 2011. *See* Ret. at 1, 3, 11; *see also* Resps.' Ex. at 2, 17, 38–39. N.B. responds that "the government again seems either to be ignorant of the facts and/or is willfully hurling misplaced accusations of fraud," Trav. ¶ 33(3)(a), because "N.B.'s cousin obtained a judgment entitling her to obtain N.B.'s birth certificate extract, on behalf of N.B.'s deceased father's estate, and on behalf of and authorized by N.B. himself, according to the Guinean Civil Code." *Id.* ¶ 33(3)(b). Consequently, "[n]o one impersonated N.B.'s father as the government claims." *Id.* In any event, N.B. contends, "the government has not shown what about the document warrants disregarding its facially certified, sealed, attestations as to N.B.'s birth information." *Id.*

Respondents also contend that N.B. had in his possession a certified copy of a Guinean birth certificate for Mohamed Saliuo Bah, born January 25, 2002. *See, e.g.*, Ret. at 3; *see also* Resps.' Ex. at 40. But "N.B. disputes that he was ever in possession of another person's birth certificate, or any birth certificate showing a 2002 birthdate." Trav. ¶ 33(5)(a).

2019, N.B. was transferred to the Otay Mesa Detention Center, *id.* ¶ 40, which is managed by CoreCivic. *Id.* ¶ 26.

On June 24, 2019, IHSC ordered a dental x-ray examination of N.B. to determine his age. *Id.* ¶¶ 29, 41; *see also* Resps.' Ex. at 24. The dental x-ray determined N.B.'s "mean age" to be 20.24 years of age, with a standard deviation of 2.98 years. Pet. ¶ 29; Resps.' Ex. at 24. Accordingly, the report concluded that "[t]he interval of possible ages for such a male is 17.26 to 23.23 years," with "[t]he empirical statistical probability of [N.B.] having attained 18 years of age [being] 93.53%." Resps.' Ex. at 24. ICE therefore concluded that N.B. would "be treated as an adult" because "the empirical statistical probability the subject[] attained 18 years of age is 93.53%." Pet. ¶ 29; *see also* Pet. ¶ 41; Ex. 12, ECF No. 1-13. Accordingly, N.B. is being detained in group quarters with more than 100 adult men. Pet. ¶ 32. These conditions have left N.B. feeling helpless, distraught, and in constant fear. *Id.* ¶ 33.

On July 16, 2019, an asylum officer conducted a credible fear interview of N.B. *See* Resps.' Ex. at 25.

On August 5, 2019, Mr. Salazar of Al Otro Lado entered an appearance as N.B.'s counsel via DHS Form G-28 and requested N.B.'s immediate release to his cousin and sponsor, Mariama Tounkara, in Columbus, Ohio, pursuant to the stipulated settlement agreement in *Reno v. Flores*, 507 U.S. 292 (1993) (the "*Flores* Settlement"). Pet. ¶¶ 30, 42; Pet. Ex. 4, ECF No. 1-5; Pet. Ex. 5, ECF No. 1-6; *see also* Pet. Ex. 13, ECF No. 1-14. That same day, Respondent Castaneda refused the request on the basis ICE would continue to treat N.B. as an adult in light of the results of the Dental Age Assessment. *See* Pet. ¶¶ 31, 43; *see also* Pet. Ex. 12.

On August 8, 2019, N.B. retained Arent Fox LLP to represent him *pro bono*. Pet. ¶ 34.

The asylum officer issued a negative credible fear determination on August 12, 2019. *See* Resps.' Ex. at 28. In response to N.B.'s request for review by an immigration judge
///

pursuant to 8 C.F.R. § 1208.30(g)(2), *see id.* at 32, N.B.'s case was referred for review on August 14, 2019. *See id.* at 30–31.

Al Otro Lado and Arent Fox LLP filed the instant Petition on behalf of N.B. on August 15, 2019. *See generally* ECF No. 1. The Petition alleges the following claims for relief: (1) violation of the TVPRA and implementing guidelines; (2) violation of the Administrative Procedure Act ("APA"), 5 U.S.C. § 706(2)(A); (3) violation of 8 C.F.R. § 1236.3(d); (4) violation of the *Flores* Settlement; (5) violation of N.B.'s procedural and substantive due process rights under the Fifth Amendment; (6) violation of the APA because of violation of N.B.'s due process rights; (7) declaratory relief pursuant to 28 U.S.C. §§ 2201, 2202; and (8) writ of habeas pursuant to 28 U.S.C. § 2241. *See* Pet. ¶¶ 71–129.

On August 16, 2019, N.B. filed an Application for Issuance of Writ or Order to Show Cause Pursuant to 28 U.S.C. § 2243, *see generally* ECF No. 3, to which Respondents filed an opposition. *See generally* ECF No. 4. On August 19, 2019, the Court issued an Order to Show Cause Pursuant to 28 U.S.C. § 2243, *see generally* ECF No. 5, ordering Respondents to show cause why the Petition should not be granted. *See id.* at 2.

On the same day, the immigration judge vacated the asylum officer's credible fear determination as procedurally defective, *see* Trav. Ex. 1, ECF No. 9-1, and ICE placed N.B. in removal proceedings under 8 U.S.C. § 1229a, pursuant to 8 C.F.R. § 1208(g)(2)(iv)(B). Resps.' Ex. at 41–42. On August 20, 2019, N.B.'s counsel submitted a second request that ICE release N.B. Trav. Ex. 2, ECF No. 9-2.

## LEGAL STANDARD

Once a petition for a writ of habeas corpus is filed in federal court pursuant to 28 U.S.C. § 2241, the court must comply with the procedures set forth by 28 U.S.C. § 2243:

> A court, justice or judge entertaining an application for a writ of habeas corpus shall forthwith award the writ or issue an order directing the respondent to show cause why the writ should not be granted, unless it appears from the application that the applicant or person detained is not entitled thereto.

. . .

> The person to whom the writ or order is directed shall make a return certifying the true cause of detention.

. . .

> The applicant or the person detained may, under oath, deny any of the facts set forth in the return or allege any other material facts.

> The return and all suggestions made against it may be amended, by leave of court, before or after being filed.

> The court shall summarily hear and determine the facts, and dispose of the matter as law and justice require.

28 U.S.C. § 2243.

# ANALYSIS

## I.  Petitioner's Capacity to Sue

In a footnote on the caption page of their Return, Respondents assert that, "[i]f Petitioner is indeed a minor, he lacks capacity to bring this action." Ret. n.1 (citing Fed. R. Civ. P. 17).

Here, Mr. Salazar twice has represented that he is acting on N.B.'s behalf pursuant to 28 U.S.C. § 2242. *See* Pet. at 34; Trav. At 34. The Court therefore construes these representations as a request for appointment of "next friend" status. *See, e.g.*, *Ward v. Ortega*, No. CV 02-1022 MMM (FMO), 2003 WL 27382360, at *1 (C.D. Cal. Jan. 23, 2003) (construing opposition to motion to dismiss petition filed by attorney on behalf of minor as request for appointment of next friend status).

The habeas statutes explicitly provide for such next friend standing: "Application for a writ of habeas corpus shall be in writing signed and verified by the person for whose

/ / /

/ / /

relief it is intended *or by someone acting in his behalf*."[5]  28 U.S.C. § 2242 (emphasis added).  The United States Supreme Court has established "at least two firmly rooted prerequisites for 'next friend' standing." *Whitmore v. Arkansas*, 495 U.S. 149, 163 (1990).  "First, a 'next friend' must provide an adequate explanation—such as inaccessibility, mental incompetence, or other disability—why the real party in interest cannot appear on his own behalf to prosecute the action." *Id.* (citing *Wilson v. Lane*, 870 F.2d 1250, 1253 (7th Cir. 1989); *Smith ex rel. Mo. Pub. Def. Comm'n v. Armontrout*, 812 F.2d 1050, 1053 (8th Cir. 1987); *Weber v. Garza*, 570 F.2d 511, 513–14 (5th Cir. 1978)).  "Second, the 'next friend' must be truly dedicated to the best interests of the person on whose behalf he seeks to litigate," *id.* (citing *Morris v. United States*, 399 F. Supp. 720, 722 (E.D. Va. 1975)), meaning the "'next friend' must have some significant relationship with the real party in interest." *Id.* (citing *Davis v. Austin*, 492 F. Supp. 273, 275–76 (N.D. Ga. 1980)); *see also Massie ex rel. Kroll v. Woodford*, 244 F.3d 1192, 1194 (9th Cir. 2001).  The Ninth Circuit has clarified that "the contours of the requisite 'significant relationship' do not remain static, but must necessarily adapt to the circumstances facing each individual detainee" because "[n]ot all detainees may have a relative, friend, or even a diplomatic delegation able or willing to act on their behalf." *Coal. of Clergy, Lawyers, & Professors v. Bush*, 310 F.3d 1153, 1162 (9th Cir. 2002).  "In such an extreme case it is plausible that a person with 'some' relationship conveying some modicum of authority or consent, 'significant' in comparison to the detainee's other relationships, could serve as the next friend." *Id.*

As Respondents themselves concede, the first *Whitemore/Massie* requirement is satisfied by N.B.'s minority status.  *See* ECF No. 4 at n.1; Ret. at n.1.  That Mr. Salazar filed the Petition—which comprises over 150 pages—pro bono demonstrates that he is "truly dedicated to the best interests of" N.B.  *See Whitemore*, 495 U.S. at 163; *see also*

---

[5] Such "next friend" standing is also authorized by Rule 17 in suits by minors.  *See* Fed. R. Civ. P. 17(c)(2) ("A minor . . . who does not have a duly appointed representative may sue by a next friend.").

*ACLU ex rel. Unnamed U.S. Citizen v. Mattis*, 286 F. Supp. 3d 53, 58 (D.D.C. 2017) (concluding that ACLU satisfied "best interests" prong of *Whitemore* test where "it is clear . . . that [the detainee] wishes to have the assistance of a lawyer"). The Court also concludes that, under N.B.'s particular circumstances,[6] Mr. Salazar has the requisite significant relationship with N.B. *See, e.g.*, *Tinsley v. Flanagan*, No. CV-15-00185-PHX-ROS, 2016 WL 8200450, at *6 (D. Ariz. May 13, 2016) ("The present record is limited but it establishes the relationships between [attorneys and minors] are all that can be expected under the circumstances. . . . Accordingly, [attorneys] satisfy the 'significant relationship' requirement."); *Nichols v. Nichols*, No. CIV. 10-651-HA, 2011 WL 2470135, at *5 (D. Or. June 20, 2011) ("[Court-appointed fiduciary]'s 'authorized representation' established a sufficient relationship for purposes of Next Friend standing in this case.").

The Court therefore determines that Mr. Salazar has met his burden of establishing the "next friend" requirements applicable to 28 U.S.C. § 2242 pursuant to the Supreme Court's decision in *Whitemore* and the Ninth Circuits decisions in *Massie* and *Coalition of Clergy*. Consequently, the Court **APPOINTS** Mr. Salazar to serve as N.B.'s "next friend."

## II. Jurisdiction

Respondents challenge the Court's jurisdiction over Counts Two, Three, Six, and Seven on the grounds that those Counts are not proper habeas claims and that the Court lacks personal jurisdiction over Respondents as to those claims. *See* Ret. at 5–7.

### A. *Habeas Jurisdiction*

"Absent intervening law, this court has jurisdiction pursuant to 28 U.S.C. § 2241." *Nguyen v. Fasano*, 84 F. Supp. 2d 1099, 1104 (S.D. Cal. 2000); *Alikhani v. Fasano*, 70 F. Supp. 2d 1124, 1126 (S.D. Cal. 1999).

Respondents' sole argument against this Court's jurisdiction is that Counts Two, Three, Six, and Seven are not proper habeas claims that therefore are subject to dismissal

---

[6] N.B.'s father died in 2011, Resps.' Ex. 38, and N.B. has not had contact with his mother, who remains in Guinea, since 2013. *Id.* at 2, 16–17. N.B.'s only relative in the United States is his cousin, who lives in Columbus, Ohio. Resps.' Ex. at 17–18, 21.

(or even warrant dismissal of the entire Petition).[7]  *See* Ret. at 5–6.  N.B. counters that "[t]he government apparently misunderstands N.B.'s habeas petition," Trav. ¶ 10, because "Counts 2, 3, and 6 are not independent civil claims under Section 1983 or any other law[, but r]ather . . . are explicitly formulated as theories of habeas relief." Trav. ¶ 11.  "As to Count 7, which seeks a declaration of N.B.'s rights pursuant to 28 U.S.C. §§ 2201 and 2202, again N.B. is not seeking independent civil relief.  Rather, he has sought a declaration of his rights in his habeas case." *Id.* ¶ 16.

The Court agrees that N.B.'s Counts Two, Three, Six, and Seven are proper habeas claims.  Ultimately, N.B. is seeking injunctive relief, Pet. ¶ 130(d), and "declaration(s) that N.B. is a minor for purposes of his immigration detention and immigration proceedings, until his eighteenth (18th) birthday," *id.* ¶ 130(b); "that Defendants' age determination of N.B. based solely on the dental x-ray assessment violated the TVPRA, 8 U.S.C. § 1232(b)," Pet. ¶ 130(c); and "that Ms. Tounkara is a qualified family-member-sponsor pursuant to ¶ 14 of the Flores Settlement Agreement."  Pet. ¶ 130(f).  He seeks no damages pursuant to *Bivens v. Six Unknown Named Agents*, 403 U.S. 388 (1971), *see generally* Pet. ¶ 130, but rather declaratory and injunctive relief, *see generally id.*, both of which are proper habeas remedies.  *See* 28 U.S.C. § 2243 ("The court shall . . . dispose of the matter as law and justice require."); *Carafas v. LaVallee*, 391 U.S. 234, 239 (1968) ("[T]he statute does not limit the relief that may be granted to discharge of the applicant from physical custody. Its mandate is broad with respect to the relief that may be granted."); Brian R. Mean, Federal Habeas Manual § 13:20 (2019) (discussing general availability of declaratory and injunctive relief in habeas actions); *see also, e.g.*, *Rodriguez v. Hayes*, 591 F.3d 1105,

---

[7] N.B.'s second count claims that "Defendants' age determination and subsequent decisions to continue detaining N.B. as an adult are arbitrary and capricious and must be set aside, pursuant to the [APA]," Pet. ¶ 82, while his third count alleges that "[t]he government's detention of N.B. . . . violates 8 C.F.R. § 1236.3(d)." Pet. ¶ 95. N.B.'s sixth count contends that "Defendants' conduct has and continues to violate N.B.'s procedural and substantive Due Process rights" in violation of the APA, Pet. ¶ 120, while his seventh count "seeks a declaration that he is a minor for purposes of his immigration detention and proceedings, until his eighteenth (18th) birthday" pursuant to 28 U.S.C. §§ 2201 and 2202. Pet. ¶ 126.

1111–12, 1119–20 (9th Cir. 2010) (reversing district court's denial of certification of habeas class seeking injunctive and declaratory relief and concluding class was not barred from obtaining injunctive of declarator relief). The Court therefore concludes that it has subject-matter jurisdiction over all claims presented by the instant Petition.

### B. *Personal Jurisdiction*

Respondents also argue that Counts Two, Three, Six, and Seven must be dismissed for lack of personal jurisdiction. Ret. at 6–7. Even in the habeas context, however, "personal jurisdiction—unlike subject-matter jurisdiction—may be waived." *Smith v. Idaho*, 392 F.3d 350, 355 (9th Cir. 2004). To the extent that Respondents' challenge to the Court's personal jurisdiction survives in light of the Court's determination that N.B. asserts only habeas claims, *see supra* Section I.A, N.B. is correct that Respondents waived any challenge to the Court's personal jurisdiction when they filed their prior Response in Opposition to Request for Immediate Relief. *See generally* ECF No. 4. The Court therefore concludes that it has personal jurisdiction over Respondents.

## III. Merits of the Petition

This brings the Court to the merits of N.B.'s claims. Respondents assert that there is "no factual basis for [N.B.'s] habeas claims" in Counts One, Four, and Five because "[t]he factors considered to reach an age determination . . . do not violate any statute or regulation," *see* Ret. at 7–12 (emphasis omitted), and that N.B.'s Count Five for custody review is premature because he "has [not] yet made an application for parole" and he "has been detained only since May 24, 2019 (fewer than six months), so it is premature to seek judicial intervention." *See id.* at 12–13 (citing *Jennings v. Rodriguez*, 583 U.S. ___, 138 S. Ct. 830 (2018); *Rodriguez v. Marin*, 909 F.3d 252 (9th Cir. 2018); *Yagao v. Figueroa*, No. 17-CV-2224-AJB-MDD, 2019 WL 1429582, at *1 (S.D. Cal. Mar. 29, 2019)). Finally, Respondents contend that N.B. cannot obtain the equitable relief he seeks because he is barred by the doctrine of unclean hands due to misrepresentations about his age made during the course of his travels to the U.S. border. *See id.* at 13–14.

/ / /

### A. Injunctive Relief

"A federal district court may grant a writ of habeas corpus if the petitioner is 'in custody in violation of the Constitution or laws or treaties of the United States.'" *Lucas v. Nielson*, No. 18-CV-07763-HSG, 2019 WL 884012, at *2 (N.D. Cal. Feb. 22, 2019) (quoting 28 U.S.C. § 2241(c)(3)). "Preliminary injunctive relief, however, is a matter of equitable discretion and is 'an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief.'" *Id.* (quoting *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008)).

In addition to the various declarations from the Court that N.B. seeks, *see* Pet. ¶¶ 130(b), (c), (f), N.B. also seeks "preliminary and injunctive relief enjoining Defendants from further unlawfully detaining N.B. in custody with unrelated adults." *Id.* ¶ 130(d). N.B. must therefore "establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter*, 555 U.S. at 20. A preliminary injunction may also be "appropriate when a [petitioner] demonstrates . . . that serious questions going to the merits were raised and the balance of hardships tips sharply in the plaintiff's favor," provided the petitioner can also establish the other two *Winter* factors. *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1134–35 (9th Cir. 2011) (quoting *Lands Council v. McNair*, 537 F.3d 981, 987 (9th Cir. 2008), *overruled on other grounds by Winter*, 555 U.S. 7) (alterations in original). "Under either standard, P[etitioner] bears the burden of making a clear showing that it is entitled to this extraordinary remedy." *Lucas*, 2019 WL 884012, at *2 (citing *Earth Island Inst. v. Carlton*, 626 F.3d 462, 469 (9th Cir. 2010)).

#### 1. Likelihood of Success on the Merits

N.B. seeks a preliminary injunction "enjoining Defendants from further unlawfully detaining N.B. in custody with unrelated adults." Pet. ¶ 130(d). As discussed above, *see supra* Section II.A, this request is premised on various bases for N.B.'s unlawful detention, including Respondents' violations of (1) the TVPRA and implementing guidance by basing

its age determination solely on a dental radiograph, *see* Pet. ¶¶ 71–91; (2) 8 C.F.R. § 1236.3(d) and the *Flores* Settlement by failing to house N.B. in a separate accommodation for juveniles, Pet. ¶¶ 92–95, 99–100, 102; (3) the *Flores* Settlement by (a) failing to place N.B. in the least restrictive setting, Pet. ¶¶ 97–98, or to release him to his cousin, *id.* ¶¶ 101–02; and (b) preventing N.B. from exercising his rights to seek judicial review of his detention placement or allege noncompliance with the minimum standards for minor detention, *id.* ¶¶ 103–05; and (4) N.B.'s due process rights under the Fifth Amendment by (a) detaining N.B. for nearly ninety days without a hearing to determine whether his detention is necessary, Pet. ¶¶ 109–11, 118–22; (b) violating N.B.'s right to family integrity by separating him from his cousin, *id.* ¶¶ 112–14, 118–22; and (c) violating N.B.'s right to be free from physical restraint, *id.* ¶¶ 115–16, 118–22.  In essence, however, each of these claims is premised upon Respondents' allegedly unlawful determination that N.B. is an adult based on the exclusive use of a dental radiograph.

　　"The TVPRA required HHS and DHS to develop procedures that '[a]t a minimum . . . take into account multiple forms of evidence, including the *non-exclusive use of radiographs*, to determine the age of [a UAC].'"  *B.I.C.*, 2016 WL 8672760, at *5 (emphasis in original) (quoting 8 U.S.C. § 1232(b)(4)).  As explained in *B.I.C.*, "Congress's mandate that radiographs not be the only basis for an age determination reflects concern about the reliability of such determinations."  *Id.* at *5.  "In 2009, the Office of Inspector General for DHS released a report that acknowledged the House Appropriations Committee had previously 'expressed concern that ICE was relying on radiographs for age determinations for aliens in its custody, and questioned the reliability of radiographic evidence that ICE uses when determining whether an individual is an adult or juvenile.'" *Id.*  "The report recognized that 'radiographs of a person's bones or teeth . . . cannot produce a specific age due to a range of factors affecting an individual's growth,' including normal biological variation, cultural and ethnic differences, the timing of puberty, diet, genetics, health, and geography."  *Id.*  "The report also stated, 'Medical professionals we spoke with expressed skepticism that a radiographic exam could be used to discover

specifically whether an individual has attained 18 years of age.  However, they did generally agree that radiographic exams could provide a usable age range.'"  *Id.*

N.B. contends that "[t]he government has itself stated that the only evidence relied upon for CBP, ICE, and CoreCivic's continued detention of N.B. with adults is the dental x-ray assessment."  Pet. ¶ 78 (citing Pet. Ex. 12, ECF No. 1-13).  Exhibit 12 is an August 5, 2019 email from Respondent Castaneda to Mr. Salazar providing that:

> On June 24, 2019, ICE Health Services Corps (IHSC) ordered a Dental Age Assessment report which was conducted by a Pediatric and Forensic Dentistry.  According to the dental age assessment the subject mean age is 20.24 with a standard deviation of 2.98 years.  The empirical statistical probability the subjects attained 18 years of age is 93.53% which is over the 75% required by policy.  Therefore, the subject will be treated as an adult.

Pet. Ex. 12 at 1.

Respondents contest that their age determination was based solely on N.B.'s dental radiograph, urging that their "determination of Petitioner's adult status is based, in the first place, on the fact that he repeatedly held himself out as an adult during his journey to the United States and did so with a passport that he conveniently lost and replaced with fraudulent documents."  Ret. at 8.  Further, "Guinean extracts of birth certificates are notoriously suspect," *id.* at 9, and, "[t]hroughout his petition, Petitioner misrepresents that he has presented to ICE a 'birth certificate' as evidence of his date of birth" because "[h]e presented an 'extract' of his birth certificate, not his birth certificate."  *Id.* at 11.

N.B. responds that each of Respondents' arguments is impermissible.  *See* Trav. ¶¶ 34–54.  First, N.B. contends that "[a]ny adverse evidence purportedly obtained via the ICE interviews should be disregarded," *id.* ¶ 37, because Respondents interviewed N.B. in a language other than his native tongue and without the presence of counsel.  *Id.* ¶ 36. Next, N.B. argues that, "[w]here an applicant states he used a falsified birth date on his documents because 'he had to lie about his age in order to' gain entry into the U.S., such falsified birthdate is 'not a permissible basis for an adverse credibility determination' by

the government." *Id.* ¶ 44 (quoting *Abuhawa v. Holder*, 378 F. App'x 741, 743 (9th Cir.), *as amended on denial of reh'g* (July 16, 2010)). Further, "the government's rejection of N.B.'s documents showing his age as 17 is based otherwise principally on the notion that documents from the Republic of Guinea are inherently suspect" and "[t]he government has not addressed the additional documentation N.B. submitted with his Petition (his education system I.D.)." *Id.* ¶ 47. Finally, "the government routinely cites as evidence only to its intake Form I-213 forms that purport to contain statements by N.B., or which do not even purport to contain statements made by N.B. but which the government nevertheless attributes to N.B.," *id.* ¶ 53, but "[t]here are several factors that cast doubt on the contents of the I-213 in this case," including that "N.B. was never provided a French translator when interviewed in Mexico" and "the government did not allow N.B. to consult with his attorneys during his most crucial interview." *Id.* ¶ 54.

The Court concludes that N.B. has carried his burden of establishing a strong likelihood that Respondents impermissibly determined that he is not a minor given the totality of the evidence presented by N.B. Not only did Respondents represent to N.B.'s counsel that their age determination was based solely on a dental radiograph in violation of the TBPRA, *see* Pet. Ex. 12, but Respondents' post hoc justifications on alternative bases for their age determination are contrary to the law and fail properly to consider the totality of other evidence probative of N.B.'s minority, including his extract of birth certificate and government-issued student identification card.

First, the Court determines that Respondents improperly considered N.B.'s representations that he was born in December 1992.[8] N.B. concedes that he misrepresented

---

[8] Respondents also contend that Petitioner used a December 2000 birthdate. *See* Ret. at 2 (citing Resps.' Ex. at 6). In his verified Traverse, N.B. "disputes this," attesting that he "never gave a December 2000 date to Mexican officials." Trav. ¶ 31(a). Not only is "[t]he government is relying on a 'system generated' intake form devoid of any underlying evidence, such as a transcript, to show that N.B. ever made this representation," but "either [N.B.] and the Mexican officials misunderstood each other as a result of the Mexican authorities' failure to provide N.B. a French translator, or who[]ever input the information into the intake system mistyped his actual birthdate, which is exactly one year later." *Id.* The Court therefore concludes that Respondents have not proven that N.B. ever used a December 2000 birthdate.

that he was an adult at certain points in his travels to the United States border, but, as he notes, *see* Trav. ¶ 39, "in the circumstance of a refugee fleeing persecution, such 'misrepresentations are wholly consistent with his testimony and application for asylum: he did so because he feared deportation to [his country of origin].'" *Akinmade v. INS*, 196 F.3d 951, 955 (9th Cir. 1999) (quoting *Turcios v. INS*, 821 F.2d 1396, 1400–01 (9th Cir. 1987)). Given that N.B. used the December 1992 birthdate only to avoid being detained or deported prior to reaching the United States border, the Court determines that Respondents impermissibly relied on N.B.'s assertions that he was born in December 1992 to contravene his evidence that he was actually born in 2001. *See* Trav. ¶ 30(b).

Next, the Court determines that Respondents improperly considered the documents that N.B. did and did not have in his possession when he arrived at the United States border. *See* Ret. at 8–11. As for the documents N.B. did not have, Respondents contend that N.B. "conveniently lost" his Guinean passport. *See id.* at 8. N.B., however, testified under oath that he lost his passport in Guatemala. *See* Resps.' Ex. at 19–20. Respondents cannot rely solely on speculation to conclude that N.B. disposed of his Guinean passport to conceal that he is not a minor.[9] *See Yun Wang v. Holder*, 404 F. App'x 196, 197 (9th Cir. 2010) (citing *Shah v. INS*, 220 F.3d 1062, 1071 (9th Cir. 2000)).

As for the documents N.B. did have in his possession, Respondents contend that N.B.'s extract of birth certificate is "fraudulent" and/or suspect based on several arguments:

- First, Respondents claim that N.B.'s extract of birth certificate was "recently acquired by someone posing as Petitioner's deceased father" and that "[t]he fact that the

---

[9] In any event, it would seem unlikely based on the very radiographic analysis upon which Respondents' now depend that N.B.'s passport would have shown that he actually was born in December 1992. *See* Ret. at 9 (insinuating that N.B.'s passport was a valid document that would have corroborated the date of birth N.B. had provided to officials). This birthdate would make N.B. twenty-seven years old, but the dental age assessment was consistent with "a male . . . 17.26 to 23.23 years." Resps.' Ex. at 24. Based on the dental radiograph results, it is therefore much more likely that N.B. was born in December 2001, as he contends, than in December 1992, as Respondents intimate.

documents were obtained under false pretenses is itself indirect evidence that Petitioner is not a minor." Ret. at 8. In his verified Traverse, however, N.B. explains that "[n]o one impersonated N.B.'s father as the government claims" because "N.B.'s cousin obtained a judgment entitling her to obtain N.B.'s birth certificate extract, *on behalf of N.B.'s deceased father's estate*, and on behalf of and authorized by N.B. himself, according to the Guinean Civil Code." Trav. ¶ 33(3)(b) (emphasis in original). The Court therefore dismisses Respondents' contention that N.B.'s documents were obtained fraudulently in light of N.B.'s explanation.

• Second, Respondents attempt to establish that N.B. has been less than forthright in his representations concerning his extract of birth certificate, arguing that N.B. "misrepresents that he has presented to ICE a 'birth certificate'" and filed with the Court a false translation indicating that the document is a "birth certificate." *See* Ret. at 11. The Court declines to conclude that N.B. or his counsel was attempting to mislead the Court. Not only is it far more likely that any confusion was due to language barriers, but the Court declines to attribute to N.B.'s counsel any fraudulent intent related to the filing of a certified translation identifying the document as a "birth certificate" rather than an "extract of birth certificate." *Compare* Pet. Ex. 1, *with* Pet. Ex. 2, ECF No. 1-3.

• Third, Respondents make much of a birth certificate belonging to Mohamed Saliou Bah that was allegedly found in N.B.'s possession. *See* Ret. at 11. In his verified Traverse, however, "N.B. disputes that he was ever in possession of another person's birth certificate, or any birth certificate showing a 2002 birthdate." Trav. ¶ 33(5)(a). Even if N.B. did possess the birth certificate of another individual born in 2002, that does not suffice to support speculation that N.B.'s other documents are fraudulent in some unspecified way.

• Fourth and most troubling, Respondents claim that "Guinean extracts of birth certificates are notoriously suspect," *see* Ret. at 8–10, without introducing any evidence that N.B.'s extract of birth certificate in particular is in any way suspect. *See* Trav. ¶ 47. As N.B. notes in his Traverse, Respondents' argument is based solely on "a Refworld

report from the Immigration and Refugee Board of Canada that itself states it 'is not, and does not purport to be conclusive.'" Trav. ¶ 4 (quoting ECF No. 4-2 at 8). The Court must agree with N.B. that "the idea that the government can prejudge an entire country's documents as inauthentic *ab initio* is preposterous—it is pernicious discrimination based on a suspect classification of national origin and alienage." *See id.* ¶ 48. In the absence of any indications that N.B.'s extract of birth certificate in particular is suspect or fraudulent, the Court determines that Respondents impermissibly relied on the generalization that *all* Guinean extracts of birth certificate are suspect in determining that N.B. is not a minor. *See Virk v. Gonzales*, 238 F. App'x 316, 317 (9th Cir. 2007) ("Because the agency improperly used the country report to discredit specific testimony regarding [the applicant]'s personal experience, these findings are not supported by substantial evidence.").

Finally, Respondents fail entirely to take into account N.B.'s government-issued photo identification. *See, e.g.*, Trav. ¶ 6. The identification card provides a photo of N.B., *see* Pet. Ex. 3, that Respondents do not contend fails to match those in N.B.'s records. *See* Resps.' Ex. at 5a–11. The photo identification card also provides a 2001 date of birth. *See* Pet. Ex. 3. This identification card corroborates N.B.'s claim that his true date of birth is in December 2001, rendering him a minor.

Viewing all evidence in its totality, N.B. had in his possession two forms of identification showing that his date of birth was in December 2001, making him a minor. N.B. forthrightly informed Respondents that he had lied about his age during his travels to avoid being deported or detained prior to reaching the United States border. Nonetheless, Respondents discredited this evidence based on speculation and generalizations, permitting them to obtain a dental radiograph that is not inconsistent with N.B.'s claim that he is nearly eighteen years old. Not only has N.B. established a high likelihood that Respondents relied exclusively on the dental radiograph in determining his age in violation of the TVPRA, but—based on the totality of the evidence before Respondents—it also appears likely that the radiograph itself was impermissible. *See B.I.C.*, 2016 WL 8672760, at *5 (noting that

the ORR Guide "permits radiographs 'if other information is inconclusive'"). Consequently, "the Court concludes that petitioner has a strong likelihood of success on the merits of his claim that [Respondents'] age determination is invalid under the TVPRA . . . . As such, petitioner also has a strong likelihood of success on his claim that respondents unlawfully placed him in DHS custody." *See id.* at *6.

### 2. *Likelihood of Irreparable Harm*

To obtain preliminary injunctive relief, N.B. must also demonstrate that "he is likely to suffer irreparable harm in the absence of preliminary relief." *B.I.C.*, 2016 WL 8672760, at *4 (quoting *Winter*, 555 U.S. at 20). "The Ninth Circuit has recognized 'the irreparable harms imposed on anyone subject to immigration detention (or other forms of imprisonment).'" *Meza v. Bonnar*, No. 18-CV-02708-BLF, 2018 WL 2554572, at *4 (N.D. Cal. June 4, 2018) (*Hernandez v. Sessions*, 872 F.3d 976, 995 (9th Cir. 2017)). This harm would appear particularly acute and irreparable where the detainee may be a minor being held in contravention of the specific protections granted by the TVPRA and *Flores* Settlement. *See, e.g.*, 8 U.S.C. § 1232(b) (indicating that one purpose of the TVPRA is to "[c]ombat[] child trafficking and exploitation in the United States"); *Flores* Settlement ¶ 11, ECF No. 1-14 (recognizing "special concern for [minors'] particular vulnerabilities"). The Court therefore concludes that N.B. has met his burden of demonstrating irreparable harm.

### 3. *Public Interest and Balance of Equities*

"[T]he harm to the opposing party and weighing the public interest . . . factors merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009).

"[T]he public interest favors applying federal law correctly." *B.I.C.*, 2016 WL 8672760, at *7 (alteration in original) (quoting *Small v. Avanti Health Sys., LLC*, 661 F.3d 1180, 1197 (9th Cir. 2011)) (citing *N.D. v. Haw. Dep't of Educ.*, 600 F.3d 1104, 1113 (9th Cir. 2010) ("[I]t is obvious that compliance with the law is in the public interest.")). "As discussed above, petitioner has established a strong likelihood of success on the merits of his claim that respondents have violated the TVPRA." *See id.*

Further, "the general public[ ha]s [an] interest in the efficient allocation of the government's fiscal resources," and "[t]he Ninth Circuit has recognized that [t]he costs to the public of immigration detention are staggering." *Meza*, 2018 WL 2554572, at \*4 (internal quotation marks omitted) (quoting *Hernandez*, 872 F.3d at 996)).  On the other hand, N.B.'s cousin is "willing and able to ensure that N.B. appears at any and all immigration hearings."  Pet. ¶ 36; *see also* Pet. Ex. 9, ECF No. 1-10.  "Given the low risk of Petitioner's causing harm to others . . . , such expenditure in h[is] case would not benefit the public."  *See Meza*, 2018 WL 2554572, at \*4.  "Accordingly, the public interest and balance of equities weigh in his favor."  *See B.I.C.*, 2016 WL 8672760, at \*7.

The Court therefore concludes that N.B. has met his burden of establishing his entitlement to a preliminary injunction "enjoining Defendants from further unlawfully detaining N.B. in custody with unrelated adults."  *See* Pet. ¶ 130(d).

### B.    Unclean Hands

Respondents argue that N.B. is barred from seeking habeas relief by the doctrine of unclean hands as a result of the alleged misrepresentations about his age made before N.B. reached the U.S. border.  *See* Ret. at 13–14.  N.B. rejoins that "[t]he Supreme Court has explicitly rejected that notion that 'ad hoc equitable departures from the Habeas Corpus Rules' [such as the doctrine of unclean hands] are 'authorized.'"  Trav. ¶ 58 (quoting *Lonchar v. Thomas*, 517 U.S. 314, 328 (1996)).  Further, "even if the Court were authorized to apply the unclean hands doctrine in this case, the government's unclean hands defense is based on the government's misunderstanding of the facts."  *Id.* ¶ 60.

Like N.B., *see id.* ¶ 59, the Court has not located any authority supporting Respondents' contention that an unclean hands defense is applicable in the habeas context. Accordingly, the Court concludes that it would be inappropriate to consider Respondents' unclean hands defense.  *See Lonchar*, 517 U.S. at 328.  In any event, the Court concludes that Respondents' alleged misrepresentations do not "render[] inequitable the assertion of [the] rights [he now asserts] against the [Respondent]s."  *See* Ret. at 13–14 (quoting *Ellenburg v. Brockway, Inc.*, 763 F.2d 1091, 1097 (9th Cir. 1985) (quoting *Republic*

*Molding Corp. v. B.W. Photo Utils.*, 319 F.2d 347, 349 (9th Cir. 1963))); *see also supra* Sections III.A.1, 3.

## CONCLUSION

In light of the foregoing, the Court (1) **APPOINTS** Mr. Salazar as N.B.'s next friend for purposes of this Petition; and (2) **PRELIMINARILY ENJOINS** Respondents from further unlawfully detaining N.B. in custody with unrelated adults, *i.e.*, Respondents **SHALL TREAT** N.B. as a minor for purposes of his immigration detention and immigration proceedings until his eighteenth birthday, as reflected on his Guinean extract of birth certificate. The Parties **SHALL FILE** a Joint Status Report within three (3) days of the electronic docketing of this Order.

**IT IS SO ORDERED.**

Dated: October 1, 2019

Hon. Janis L. Sammartino
United States District Judge